**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**
**No. 7:24-CV-00707-FL**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT** | ) | |
| **OPPORTUNITY COMMISSION** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **ORDER ON ELECTRONICALLY** |
| **v.** | ) | **STORED INFORMATION** |
| | ) | |
| **CHAMPION MEDIA, LLC D/B/A** | ) | |
| **THE ROBESONIAN** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| _____ | ) | |

The parties, Plaintiff Equal Employment Opportunity Commission ("EEOC") and Defendant, Champion Media, LLC d/b/a The Robesonian jointly agree to conduct discovery in a cooperative manner in adherence to the proportionality standards of the Federal Rules of Civil Procedure and propose that these provisions shall govern preservation of electronically stored information ("ESI") relating to this litigation and the scope of and protocols for production of ESI during this Action. Nothing herein shall be deemed to limit or waive any party's right to object to or limit discovery requests, including any requests for ESI.

## I.     DEFINITIONS

A.     **"Aggrieved Individual"** means the individual for whom EEOC seeks relief in this suit, i.e. Latasha Gilbert.

B.     **"Unstructured Data"** refers to free-form data which either does not have a data structure or has a data structure not easily readable by a computer without the use of a specific program designed to interpret the data, created without limitations on formatting or content by the program with which it is being created. Examples include word processing documents, slide presentations, Email, or short messages, including text, Microsoft Teams, WhatsApp, and Slack messages.

C.    **"User-Created Files"** means any ESI created by entering text or content composed by an individual person through the use of any local or network software application and stored by a user, such as spreadsheets, word processing documents, and other similar ESI.

D.    "**Structured Data**" is data stored in a structured format, such as databases, spreadsheets, tables, or data sets according to specific form and content rules as defined by each field of the database.

E.    "**Search Terms**" means a word or a string of words or phrases joined by proximity and Boolean connectors and other syntax designed to capture potentially relevant ESI.

F.    **"Database Systems"** means any system consisting of a group of integrated files, which is stored in one location or distributed across multiple locations in a network, and made available to several users, and consisting of a tabulation of corresponding information which can be searched, organized, classified, and accessed in multiple ways.

## II.    LIAISON

The parties have identified liaisons, Maria Salacuse for the EEOC, and Brandye Fenn, Litigation Support Manager, FordHarrison LLP for Champion Media, LLC d/b/a the Robesonian, who are and will be knowledgeable about and responsible for discussing their respective ESI. Each e-discovery liaison will be, or have access to those who are, knowledgeable about the technical aspects of e-discovery, including the location, nature, accessibility, format, collection, search methodologies, and production of ESI in this matter. The parties will rely on the liaisons, as needed, to confer about ESI and to help resolve disputes without court intervention.

## III.    RELEVANT ESI SOURCES AND CUSTODIANS

The parties have in good faith identified in <u>Exhibit A</u> ("Relevant ESI Sources") the Email, User-Created Files, Database Systems, and Mobile Devices that are reasonably believed to contain relevant information during the Temporal Scope of Preservation (*See* <u>Section IV</u>).

2

The parties also agree that it is reasonable and appropriate to limit the scope of discovery of unstructured ESI (Emails and User-Created Files) to the individuals listed in <u>Exhibit B</u> ("Custodians").

To the extent that the parties identify additional ESI sources for preservation and potential production, or if upon further investigation revision to the existing descriptions or identified custodians is necessary, the parties shall identify the additional sources or custodians and/or revise existing descriptions or custodians.

## IV.    PRESERVATION OBLIGATIONS

The parties shall preserve relevant information from the sources and custodians identified in Exhibits A and B created, modified, or sent between March 1, 2023 and Present ("Temporal Scope of Preservation"). The parties shall take reasonable steps to preserve relevant ESI created or modified within the Temporal Scope of Preservation that is within their possession, custody or control including, but not limited to, issuing litigation holds.  Notwithstanding this date limitation for the preservation of ESI, the parties are required to preserve any documents known to contain relevant information regardless of the created or modified date.

The parties agree that to the extent the representations made in negotiating this Protocol are in error, either unintentionally or intentionally, and upon a showing of good cause by the requesting party, the parties reserve their right to seek curative measures.

The parties agree that the following ESI is not reasonably accessible: (List specific ESI known).

Deleted, shadowed, fragmented, residual, or cached data, temporary files, random access memory ("RAM"), or ESI that would only be accessible by taking a forensic (bit stream) image of a device;

1.    Server, system, or network logs; and

3

**2.** Back up tapes or other storage media used for disaster recovery purposes where the data on the tapes is duplicative of data stored elsewhere and is being preserved by the party.

**3.** Data from closed and/or inoperable email or social media accounts which cannot be accessed due to a provider ceasing operations.

Additional data sources may be identified as a result of investigation, and the parties shall promptly identify any additional data sources that they believe are not reasonably accessible. The parties will meet and confer about such ESI as additional data sources are identified. However, nothing herein shall prevent a party from subsequently requesting that ESI identified above be produced if specific facts demonstrate a particular need for such evidence that justifies the burden of preservation and retrieval. Further, nothing herein shall prevent a party from requesting and receiving additional detail and explanation from the producing party regarding any of the above items that would allow the requesting party to further evaluate the substance of the information and the burden and costs of retrieving and providing this information. In addition, the parties agree to continue to meet and confer regarding identification, preservation, and production with regard to specific data systems.

## V. SEARCH AND COLLECTION

### A. Scope

The parties shall search and collect relevant information from the sources and custodians identified in Exhibits A and B created, modified, or sent between March 1, 2023 to Present, inclusively ("Temporal Scope of Discovery"). The Court may alter the Temporal Scope of Discovery in response to motion or on its inherent authority.

Although this Protocol envisions the use of electronic search methodologies, *see infra*, to search for and collect potentially responsive documents, where a party knows or reasonably should know that information is relevant and responsive to a document request, it shall not withhold that

4

document from production on the basis that its electronic search methodology did not otherwise identify the document.

**B.     Supervision of Collection**

The parties agree that any collection of ESI shall be done under the proper supervision of counsel and that unsupervised ESI self-collection does not comply with Federal Rule of Civil Procedure 26(g).

**C.     The Use of Search Terms to Search and Collect Unstructured ESI**

If the producing party determines the use of search terms is necessary and appropriate to search and collect relevant and/or responsive ESI, the parties shall collaborate and cooperate in good faith and attempt to exhaust all efforts to reach an agreement on a set(s) of search terms to be used.  The parties shall collaborate and cooperate in good faith and attempt to exhaust all efforts to reach agreement about additional set(s) of search terms or other culling criteria to identify relevant Short Messages, including, but not limited to, Slack, Microsoft Teams, WhatsApp, Facebook Messenger, or other internal or communications devices which Defendant administers.

1.     Within a reasonable time, following disclosure of a party's proposed search technology or process, the producing party shall develop and share with the requesting party a list of proposed search terms. At the same time, if the producing party is using a tool other than Relativity, the producing party shall also provide information to the requesting party regarding the syntax and search capabilities and limitations of its ESI tool with respect to search terms (e.g., ordering of search terms and parentheses, what wildcard options are available, stemming capabilities, noise words, Boolean capabilities, etc.) sufficient for the requesting party to understand the search terms proposed and to offer counterproposals to them.

5

2. The requesting party shall provide any revisions or additions to the producing party's proposed search terms ("counterproposals"), if any, within a reasonable time (to be agreed upon between the parties) after receipt of proposed search terms from the producing party.

3. After receipt of the first set of revisions or additions from the requesting party (as set forth above), and within a reasonable period after receipt of the counterproposals (to be agreed upon by the parties) or receipt of any revisions in subsequent comments rounds, if applicable, the producing party will identify which of the requesting party's proposed search terms the producing party agrees to use, and which terms it rejects, and shall propose alternatives to counterproposals to which it objects. Upon request, the producing party shall confer with the requesting party concerning the producing party's reasoning behind why particular search terms are not acceptable and possible alternative search terms. The producing party shall then, in a reasonable period of time, but no more than 15 business days, supply a Search Terms Hit Report ("STH Report"), as described in subsection (5) below, for all search terms that were accepted, rejected, and all proposed alternatives.

4. The parties shall reasonably repeat the process in subsection (2) and (3) in good faith to come to a final agreement regarding search terms. The parties will meet and confer regarding disputed search terms and STH Reports as needed. The parties shall meet and confer to attempt to develop a mutually agreeable means of evaluating the effectiveness of disputed search terms in identifying responsive documents, such as a responsiveness review of a statistically significant random sample of the documents hit by a disputed term.

6

5.　**STH Report**: STH Reports will be provided in Excel (or other format as agreed to by the parties). An STH Report should: (a) exclude from the number of hits any duplicates; (b) provide the number of documents hit by the search term, including family members; and (c) the number of unique documents hit by each search term (i.e., the number of documents hit by that search string and no others, and not previously produced in this litigation).

6.　**Validation**: Once the parties have agreed to a list of search terms subject to the process outlined above, the parties shall meet and confer to attempt to develop a mutually agreed methodology to determine effectiveness of search terms in identifying responsive documents. The parties shall meet and confer regarding whether further modification to the final set of search terms is necessary.

7.　The mere fact that a document is hit or captured by the application of any agreed upon search terms does not mean that such document is necessarily responsive to any propounded discovery request or is otherwise relevant to this litigation.

**D.　Structured Database Systems**

To the extent a response to discovery requires the search and collection of discoverable ESI contained in a structured database system, the parties shall meet and confer in an attempt to agree upon a set of reasonable queries to be made for discoverable information and generate a report in a reasonably usable and exportable electronic file for review by the requesting party.

**E.　Custodial Mobile Device Data**

For Custodians agreed on by the parties in Exhibit B or ordered by the Court, a producing party will take reasonable steps to identify whether any unique, responsive, discoverable communications are located on any mobile device in the "possession, custody, or control" (as defined under the Federal Rules and case law) of the producing party. The producing party is

7

obligated to disclose if it takes the position that a custodian possesses a mobile device that was used for work purposes is not within the producing party's possession, custody or control. The producing party shall provide an explanation and support for their position that a mobile device is not within the producing party's possession, custody, or control.

If a requesting party intends to issue a third-party subpoena directed at an employee of a producing party concerning that employee's mobile device that is not in the producing party's possession, custody or control, the requesting party will provide notice of its intent to the producing party so that the parties may meet and confer regarding the third-party subpoena. The requesting party may serve the subpoena five (5) business days after the date of notice or at such earlier time agreed by the parties.

## VI. PROCESSING, FILTERING AND REVIEW

The processing and review of Unstructured ESI may consist of any of the following processes selected by the producing party: (1) loading of ESI into a review platform; (2) the application of file type, date, and other metadata filters; (3) the use of search terms, as outlined *infra* in Section VI(A); (4) de-NISTing, and deduplication of identical files, as outlined *infra* in Section VI(B); (5) the use of analytics technologies, including email threading, clustering, filtering, categorization, and technology assisted review/ predictive coding, as outlined *infra* in Sections VI(C)-(F); and (6) attorney review for responsiveness.

Parties will review the results of the above efforts for privilege or other protection from disclosure and all responsive, non-privileged ESI shall be produced in the format described below in Section VII.

8

## A. The Use of Search Terms on Unstructured ESI to Filter and Review

If the producing party finds it appropriate to apply search terms to cull the collected ESI before review, the parties shall follow the process outlined in Section VI, *supra*.

## B. Deduplication and De-NISTing System Files

The parties agree to make good faith efforts to globally de-dupe Custodian ESI on hash values to the extent that it is possible, meaning that only one copy of a document may be produced even if the same document is within other Custodians' ESI.

The parties agree that system and application files without user created content (as identified by matching to the NIST National Software Reference Library database) need not be processed, reviewed or produced. This process is commonly referred to as "De-NISTing." The producing party shall disclose any other system files that it intends to exclude from collection and/or search to the requesting party.

## C. Email Domain Exclusions

Producing parties may utilize an ESI search process to identify categories of documents, such as emails from domains typically associated with junk email, such as retailer advertising, and newsletters or alerts from non-industry sources.

## D. Spam and Virus Filtering

Absent compelling circumstances and upon notice by a requesting party to a producing party, any message, attachment or other electronically stored information that has been identified by a spam or virus filter shall be treated as per se non-responsive and a party shall not be required to preserve, review, or produce such ESI.

9

### E.    Technology Assisted Review / Predictive Coding

The parties also recognize the availability of a variety of search tools and methodologies, including but not limited to Technology Assisted Review (TAR). If the producing party intends to use TAR or similar advanced analytics as a substitute for attorney responsiveness review, the parties agree to meet and confer in good faith to attempt to reach agreement about the technology and process that a producing party proposes to use to identify responsive ESI and a statistically sound methodology to determine the recall rate and other measures of the effectiveness of the tool and processes in identifying responsive documents. The producing party shall make disclosures regarding its tools and processes necessary to make the meet and confers meaningful and for the requesting party to negotiate on an informed basis.

If, prior to commencement of negotiations over search terms, a producing party intends, or is likely, to use both search terms and TAR (or similar advanced analytics), it shall notify the requesting party prior to commencement of search term negotiations. If a producing party decides to employ TAR or similar advanced analytics during, or after the conclusion of, negotiations over search terms, it shall promptly notify the requesting party before commencing any review. Under either of these circumstances, the parties shall meet and confer regarding the use of search terms prior to application of TAR is appropriate, and if so, how, to what extent, and under what conditions search terms may be applied.

### F.    Email Threading

The parties may utilize email threading technology in their review to thread email messages where the content of those messages, and any attachments, are wholly contained within a later email message in the thread (Inclusive Emails).   The parties agree that the producing party may choose to only include Inclusive Emails in the data set subject to keyword searches and/or TAR search process (as agreed upon in this Protocol), but if the producing party chooses to only include

Inclusive Emails in the review set, the producing party will disclose its decision to the requesting party. While the parties agree to the search and review of only Inclusive Emails, the parties will produce entire email threads, including non-inclusive emails.

## VII. FORMAT OF PRODUCTION

The parties agree to the format for production as described herein as well as Exhibit C for Plaintiff EEOC and Exhibit D for Champion Media, LLC d/b/a the Robesonian.

### A. Paper Documents

Hard copy documents shall be scanned to single-page TIFF Group IV format (300 DPI resolution) with corresponding searchable OCR text and be logically unitized. The file name for the TIFF image shall be the Bates/PageID Number. Scanned documents shall also be converted into searchable text using optical character recognition (OCR), extracted and saved as a text file named with the Bates/PageID Number. The OCR shall include the Bates/PageID number for each page. The load file shall include a field for the OCR/Text file path.

### B. Email and User-Created Files

The parties will produce documents in accordance with the specifications identified in this section. ESI will generally be produced in single-page TIFF format (300 DPI resolution) with corresponding document-level extracted text and a delimited DAT file containing the metadata fields outlined in Exhibits C and D.

1. All spreadsheet and presentation files (e.g., Excel, PowerPoint) shall be produced in native format with an associated placeholder image, and a native file path contained in the DAT file to the native file.

2. All hidden text (e.g., track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file.

3. All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

11

4.     The parties agree to take reasonable steps based on industry standards to open password-protected or encrypted files, including using commercially accessible software as well as requesting passwords from those individuals which the Parties represent. If there are potentially responsive encrypted or password protected documents, which the producing party has been unable to, after reasonable efforts, to locate the password or decrypt, the parties shall meet and confer. If a party believes that removing password protection is unduly burdensome, the parties shall meet and confer.

5.     The producing party shall disclose any substantive gaps, errors, or exceptions in the collected or processed ESI.

## C.     Family Relationships and Hyperlinked Documents

Parent-child relationships (association between an attachment and its parent document) shall be preserved. The attachment(s) shall be produced adjacent to the parent document, in terms of Bates numbers, with the first attachment being named with the next sequential number after the parent, and any additional attachment(s) sequentially numbered after that first attachment. The Parties agree that if any part of a Document or its attachments is responsive, the entire Document and attachments will be produced as responsive, except any attachments that must be withheld or redacted and logged based on privilege. Withheld documents should be replaced with slip sheets.

The producing party shall use best efforts to produce "Modern attachments"[1] contained within emails or other Unstructured Data in a reasonably usable form that will identify the connection between the "parent" message (the originating message containing the modern attachment) and the modern attachment. The producing party shall meet and confer with the requesting party to discuss proposed formats of production for modern attachments. To the extent that a unique modern attachments points to a drive, folder, or other ESI that is not an individual file, parties shall meet and confer to discuss production.

---

[1] For the purposes of this Protocol, Modern attachments include embedded files, hyperlinks or other methods that point a user to files stored in the cloud or a shared repository such as SharePoint and other types of collaborative data sources, instead of being directly attached to a message, as has been historically common with email communications.

### D. Social Media and Short Messages

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn etc.), or short messaging platforms (e.g., WhatsApp, Slack, Teams, etc.), the producing party shall discuss the potential export formats and make good faith efforts to reach agreement about what additional messages will be produced in proximity to the responsive message(s).

Short Messages shall be produced in a searchable format that preserves the presentational features of the original messages, such as emojis, images, video files, animations, and the like. Short Messages must not be converted to non-unitized file formats such as PDF or TIFF. In general, Short Messages should be produced in the same format as that in which they were exported for purposes of collection, search, or review. Per Section I(C) of this Protocol, hyperlinks contained within Short Messages should be produced in a useable format.

### E. Custodial Mobile Device Data

Prior to any production of responsive data from mobile devices, the producing party shall discuss the potential export formats and the method and tool used for extraction.

### F. Redacted Documents

Documents that contain redactions, including any associated family members, will be produced in single-page TIFF format (300 DPI resolution) with corresponding document-level extracted text and a delimited DAT file containing the metadata fields outlined in Exhibit C to the extent that such metadata fields are not part of the redaction. Documents produced with redactions shall identify in some manner (such as through highlighting in black or through the use of redaction boxes) the location and extent of redacted information. To the extent a party deems production of redacted TIFF images of Excel spreadsheets significantly degrades the usability of the document, the parties agree to meet and confer regarding alternate production methodologies of the redacted information.

13

### G. Structured Database Systems[2]

The default form for production of database information is "fielded tables" where each row represents a database record and each column represents a single data field, such as a Microsoft Excel spreadsheet or delimited text file. The producing party will provide a description of the fields contained in their structured databases, including any codes used. Upon review of the report, the requesting party may make reasonable requests for additional information to explain the database schema, codes, abbreviations, and different report formats or to request specific data from identified fields.

## VIII. ADDITIONAL CONSIDERATIONS

### A. Inadvertent Disclosure of Privileged Information

Nothing herein shall be deemed to waive or limit any applicable privilege or to affect the ability of a party to seek relief for the disclosure of information protected by privilege regardless of the steps taken to prevent disclosure. If a party produces information that it later discovers, or in good faith later asserts, to be privileged or otherwise protected from disclosure, the production of that information will not be presumed to constitute a waiver of any applicable privileges and the party receiving the inadvertently produced information may not argue that the producing party failed to take reasonable steps to prevent production of the privileged materials in support of an argument that any privilege has been waived.

---

[2] To the extent a party asserts privilege over any document belonging to a family that is in any part otherwise subject to production, the family relationship must be preserved in the production and such privilege claim asserted through redaction and not withholding. This remains true even if the privilege claim applies to the entirety of one or more logically unitized documents or members within a family. In such instances, the documents will be produced with the family, with redaction applicable to the full document consistent with this paragraph. To the extent a party asserts privilege over any document belonging to a family that is in any part otherwise subject to production, the family relationship must be preserved in the production and such privilege claim asserted through redaction and not withholding. This remains true even if the privilege claim applies to the entirety of one or more logically unitized documents or members within a family. In such instances, the documents will be produced with the family, with redaction applicable to the full document consistent with this paragraph.

In such circumstances where a party discovers that it has inadvertently produced privileged documents, the producing party shall notify the requesting party. This notification shall identify the inadvertently produced documents by BEGDOC# and ENDDOC# numbers, as those documents were produced in discovery. Upon receipt of this notification, the requesting party shall not review the inadvertently produced materials and shall make reasonable efforts to segregate them.

The producing party, within five (5) days of notifying the requesting party of the inadvertent production, shall provide the requesting party with a detailed privilege log for the inadvertent production. The privilege log will include, for each document identified by the producing party, the privilege asserted, the basis for the privilege, the names of the parties involved (e.g., author, recipient(s)), and their roles. If the requesting party wishes to dispute the claim of privilege, it may file a motion with the Court under seal within ten (10) days of receiving the privilege log. The requesting party will be provided with an additional ten (10) days to file a motion if the producing party identifies more than 100 documents in its privilege log. Otherwise, within the same 10-day period, for any documents for which the requesting party is not disputing the claim of privilege, the requesting party shall (a) return the materials (including all copies thereof) to the producing party; or (b) destroy the materials (including all copies thereof) and confirm in writing to the producing party the destruction of such materials, including all later created excerpts, summaries, compilations, and other documents or records that include, communicate, or reveal the information claimed to be privileged.

The information in dispute shall remain sequestered until the Court rules on the motion or the parties agree otherwise. The sequestered information will then be returned, destroyed, or released from sequestration in accordance with the Court's direction. The parties agree that nothing

in this Order allows the requesting party to access, review, or share the information until any challenge to privilege is resolved by the Court.

**B.  Redactions**

The producing party may use redactions to protect attorney client, work product, other legally recognized privileges, or Sensitive Personally Identifiable Information (SPII),[3] consistent with any operative order concerning privilege that is agreed upon by the parties and/or entered in this litigation. Absent further order of the Court or agreement of the parties, no redactions for relevance may be made within a produced document. To the extent that a producing party maintains that an otherwise responsive document contains certain highly sensitive information that should be redacted for reasons other than those permitted by this Paragraph, the parties shall meet and confer concerning the proposed treatment of such information. If the parties do not agree, the producing party may submit the document to the Court under seal for review in camera and seek an order concerning the appropriate treatment of the disputed information.

**C.  Privilege Logs**

The producing party shall supply a log of all the documents withheld or redacted under a claim of privilege and/or work product with sufficient information to allow the requesting party to understand the basis for the privilege claim. The log shall be produced in an electronic and easily searchable and manipulatable format (such a CSV file). Absent a showing a good cause, the parties agree that Communications involving trial counsel that post-date the EEOC's Letter of Determination need not be logged.

---

[3] For purposes of this matter, SPII includes personal medical or health records not relevant to this litigation or protected by HIPAA, personal credit card or personal bank account numbers, social security numbers, tax identification numbers, or other sensitive personal information of Aggrieved Individuals, individual employees or agents of the parties, or individuals not a party to this litigation.

16

**Categorical Privilege Log:** The parties further agree that, in order to promote efficiency and cost reduction, documents can be logged on a categorical basis. The parties should identify categories into which the withheld documents can be arranged that will permit the requesting party to assess the basis for privilege and the general subject matter of the documents in the category. The categorical log should, at a minimum, include the following: (i) date ranges of withheld documents; (ii) authors/recipients; (iii) document type; (iv) category description; (v) privilege basis; and (vi) number of documents withheld.

Should a requesting party have a good faith reason to believe a particular category on a privilege log is responsive and does not reflect privileged discoverable information, the requesting party may request, and the producing party will not unreasonably refuse, to create a privilege log for that category in compliance with Federal Rule of Civil Procedure 26(b)(5).

### D. Metadata

The parties shall take reasonable steps to preserve relevant metadata fields listed in <u>Exhibit C</u> for Email and User-Created Files to the extent it is relevant, available, and has been maintained in the ordinary course of business.

### E. Continued Operation of Systems

Nothing in this order shall prohibit the following actions taken in the ordinary course of business: (1) routine maintenance, operation, or replacement of computer systems or equipment; and (2) upgrading, loading, reprogramming, customizing, or migrating software, even if such actions modify or alter the way in which ESI is maintained, stored, or viewed, provided the integrity of relevant ESI is reasonably maintained.

### F. Review for Responsiveness and Privilege

Nothing contained herein is intended to or shall serve to limit a party's right to conduct a review of documents, ESI or information (including metadata) for relevance, responsiveness and/or segregation of privileged and/or protected information before production.

**G.    Relief from Court**

If the parties are unable to agree, need further clarification on any issue relating to the preservation, collection, or production of ESI, or require modification of this Protocol, any party may seek appropriate relief from the Court.

IT IS SO ORDERED.

Dated this 13th day of January, 2025.

LOUISE W. FLANAGAN
United States District Judge

18

**EXHIBIT A**

**RELEVANT ESI SOURCES**

**I. RELEVANT ESI SOURCES FOR DEFENDANTS**

**A.    Unstructured Data**

    **1. Email:** Office 365

    **2.    Other User-Created Files:** SharePoint

    **3.    Short Messages:** Teams Chat

**B.    Cellular Phones:** No company-issued phones

**C.    Database Systems**

## II.     RELEVANT SYSTEMS FOR PLAINTIFF:

### A.  Unstructured Data

**1.**      **Email:** EEOC migrated migrating its GroupWise email system to Office 365 in or around November 2017 and has used Office 365 at all times since.  Emails are archived and can be exported.

**2.**      **User-Created Files:** User created files are routinely kept in network server locations. EEOC employees are issued laptops that double as desktop computer hard-drives.

### B.      Structured Database Systems

**1.**      ARC is used by EEOC staff to maintain information relating to the charge and charge processing, including, but not limited to, the charging party's name, address, and demographics and respondent company address and profile information.

## III. RELEVANT SYSTEMS FOR AGGRIEVED INDIVIDUALS:

| Custodian | Source Type | Source | Account / Model |
|---|---|---|---|
| Latasha Gilbert | Email | | |

**EXHIBIT B**

**CUSTODIANS**

**I.     PLAINTIFF**

- The United States Equal Employment Opportunity Commission

- Latasha Gilbert

**II.    DEFENDANT**

- Megan Andriatch

- Corey Champion

- Allyson Nysted

- Horace Skipper

- Denise Ward

**EXHIBIT C**

**PLAINTIFF EEOC PRODUCTION SPECIFICATIONS**

See the attached EEOC Form of Production / Load File Specifications

22

**EXHIBIT D**

**DEFENDANT CHAMPION MEDIA, LLC D/B/A THE ROBESONIAN PRODUCTION SPECIFICATIONS**

See the attached EEOC Form of Production / Load File Specifications